# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
### (Alexandria Division)

| | |
|---|---|
| KEVIN D. ASH, )<br>)<br>And )<br>)<br>KEVIN D. ASH, derivatively on behalf of )<br>ELLISDALE CONSTRUCTION, LLC )<br>)<br>    Plaintiffs, )<br>)<br>    v. )<br>)<br>RICHARD D. WARD )<br>    *Serve to:*    912 Cutter Lane )<br>                    Park City, UT 84098 )<br>)<br>    Defendant. ) | Case Number: 1:24-cv-921 |

## COMPLAINT

Plaintiffs Kevin D. Ash ("Mr. Ash" or "Plaintiff"), for himself, and Kevin D. Ash, derivatively on behalf of Ellisdale Construction LLC ("Ellisdale"), hereby file this Complaint against Defendant Richard E. Ward, II ("Mr. Ward" or "Defendant"), praying for damages to be entered in favor of Plaintiff, and in support thereof state as follows:

## PARTIES, JURISDICTION, AND VENUE

1. Ellisdale Construction LLC ("Ellisdale") is a limited liability company organized under the laws of Maryland, with its principal place of business in Loudoun County, Virginia at 113 E. Market Street, Suite B40, Leesburg, VA, 20176.

2. Kevin D. Ash is a natural person residing in Loudoun County, Virginia. Mr. Ash is a 50% owner of Ellisdale who takes an active role in managing its affairs and is presently, and has been since the inception of the company, the company's named CEO and President.

3. Richard E. Ward, II is a natural person residing in Park City, Utah. Mr. Ward is a 50% owner of Ellisdale who is a "silent partner."

4. The Court has original jurisdiction in this action under Title 28, Section 1332 of the United States Code, as this lawsuit is a civil action between citizens of different states and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

5. Mr. Ward is subject to the Court's personal jurisdiction, as Mr. Ward regularly conducted business with Ellisdale and has committed tortious acts against Ellisdale or breached the Ellisdale Operating Agreement within the Commonwealth of Virginia, and within this District and Division, as alleged herein.

6. To the extent Mr. Ash's claims are derivative, as a 50% owner of Ellisdale, he is fairly and adequately represents the interests of Ellisdale. Furthermore, the Parties have been in litigation together on at least three other occasions and are deadlocked on how they see the issues laid out in this Complaint. They are also in the process of winding down Ellisdale. As such, any effort to cause Ellisdale itself to bring this action is not likely to succeed.

## STATEMENT OF FACTS

*Background*

7. Ellisdale was formed on October 8, 2004, as Ellis Denning Construction, LLC. On December 28, 2009, it changed its name to Ellisdale Construction LLC.

8. Effective January 1, 2010, Mr. Ash and Mr. Ward executed an Amended and Restated Operating Agreement of Ellisdale Construction, LLC (the "Operating Agreement"). (Exhibit A).

9. During its years of operation Ellisdale provided a wide variety of construction services, including pre-construction consulting, design, and general contracting.

10. At the time of its formation Mr. Ash brought over a decade of high-level construction management experience to Ellisdale having previously managed tens of millions of dollars' worth of projects in some of the industries' leading companies.

11. By contrast, Mr. Ward has operated as a silent partner, working largely in business development, and only occasionally consulting regarding Ellisdale's finances.

12. Under the terms of the Operating Agreement Mr. Ash and Mr. Ward each hold a 50% membership interest in Ellisdale.

13. The Operating Agreement designated Mr. Ward and Mr. Ash as Managers of Ellisdale collectively forming its Board of Managers.  Operating Agreement (Ex. A) § 6.02.  The Board of Managers has "complete and exclusive control of the management of the Company's Business and affairs."  *Id.* at § 6.01.

14. The Operating Agreement provides that "[e]ach Manager will . . . be a fiduciary with respect to the Company."  *Id.*; *accord id.* at § 7.

15. The Operating Agreement named Mr. Ash as the President and CEO of Ellisdale. *Id.* at § 6.10.  As such, under the terms of the Operating Agreement, only Mr. Ash—not Mr. Ward—has "authority to (i) enter into contracts with customers, subcontractors or suppliers; (ii) hire employees and agents of the Company for such reasonable compensation as he will determine; (iii) terminate employees and agents of the Company; and (iv) execute, acknowledge and deliver any and all instruments to effectuate the foregoing."  *Id.*

16. Importantly, the Operating Agreement states that "an individual Member or Manager does not have any authority to: (a) purchase, sell, exchange or otherwise dispose of any real or personal property by the Company having a value (including a value on the books of the Company) in excess of $50,000."  *Id.* at § 6.09.

17. The Operating Agreement further provides: "The Company's funds will be deposited in the Company's name in such bank or financial accounts as may be designated by the Board of Managers, and the Board of Managers will arrange for the appropriate conduct of such accounts, including the signatures to be required." *Id.* at § 14.01.

18. Finally, the Operating Agreement provides that "[a]ny party seeking to enforce his or her or its rights [t]hereunder will be entitled, if substantially successful, to recover reasonable attorney's fees and expenses incurred in such enforcement against any party or parties who will have necessitated such enforcement because . . . such party or parties have breached, or attempted to breach, any obligations owing to the enforcing party under the provisions of this Agreement . . . ." *Id.* at § 17.13.

*Mr. Ward Surreptitiously Transfers Millions of Dollars of Ellisdale's Funds to Himself*

19. This is not the first time Mr. Ward has engaged in misconduct with respect to Ellisdale. In 2020, Ellisdale was in negotiations to be purchased by a third party. During these negotiations, this third party stated that it would not do business with Mr. Ward following the sale.

20. In response, Mr. Ward, without notice to Mr. Ash, improperly transferred $2,500,000 from the accounts of Ellisdale and two related companies to his personal bank account.

21. In addition, Mr. Ward appeared at the office of the potential purchaser and became disruptive and disorderly, causing the purchaser to terminate the potential sale.

22. When the unauthorized transfers were discovered, Mr. Ash filed suit in the United States District Court for the Eastern District of Virginia, alleging fraud, breach of contract, breach of fiduciary duty, and conversion. (Exhibit B).

23. After suit was filed, the Parties entered into a Memorandum of Understanding that would govern the voluntary dissolution of Ellisdale (the "MOU"). The MOU requires Ellisdale to

"complete the current construction projects and other obligations for which the Company was engaged prior to the Effective Date." It further states that "the Parties will refrain from soliciting new business and/or taking on new work." Finally, the MOU states: "the Parties shall work cooperatively with one another to pursue a mutual agreement upon the terms of the eventual dissolution of the Company. (Exhibit C).

24. Having paid back $500,000.00 of the improperly transferred funds, Mr. Ward also signed a promissory note, guaranteeing the return of $2,000,000 to Ellisdale by December 31, 2023. (the "Promissory Note"). (Exhibit D). As of the date of this Complaint, Mr. Ward has repaid $1,575,000, leaving a total of $425,000.00 of outstanding principal payable to Ellisdale from Mr. Ward under the terms of the Promissory Note.

25. Following the execution of the MOU, Mr. Ash worked to start an independent and unrelated new business venture and trusted Mr. Ward to abide by the terms of their agreements. At this point in time, Ellisdale was servicing its existing contracts, but not taking on new business.

<u>*Mr. Ward Makes Additional Misappropriations*</u>

26. In addition to the unauthorized transfers descibed above, Mr. Ward failed to abide by the terms of his agreements with Plaintiffs, including the Operating Agreement, in other wasy. Specifically, on or about April of 2022, Mr. Ash came to learn that Mr. Ward had, again, made several new unauthorized transfers from Ellisdale's accounts.

27. First, in December of 2020, Mr. Ward directed one, or both, of two former employees, Ms. Danielle Black ("Ms. Black") and Ms. Tina Copeland ("Ms. Copeland"), to increase his own salary by $200,000 a year. This was done without Mr. Ash's knowledge or consent, in contravention of the Operating Agreement, and in contravention of more than a decade of established procedure for compensation changes at Ellisdale. Mr. Ward had told these former

employees that he would be buying Mr. Ash out of Ellisdale and to ignore Mr. Ash's directions. In fact, a purchase agreement was drafted and negotiated, but Mr. Ward inexplicably refused to sign at the last minute.

28. Thereafter, in October of 2022, one of Ellisdale's final projects came to an end. At the conclusion of that joint venture, seven of Ellisdale's employees left the company. Without Mr. Ash's knowledge or approval, Mr. Ward gave departing employees "bonuses" and/or "severance" totaling over $350,000. In a later Zoom meeting that was recorded with the consent of all parties present, Mr. Ward admitted that he had instructed Ms. Black and Ms. Copeland to process these bonuses and, moreover, had specifically instructed them to not inform Mr. Ash of these illicit outlays.

29. Mr. Ward hoped that, in paying the unauthorized bonuses, he would buy favor for himself with the current employees of Ellisdale and with members of the construction community in the Washington, D.C. area, and his other personal business interests.

30. Finally, Mr. Ward also made numerous other misappropriations of Ellisdale's funds without Mr. Ash's knowledge or consent. These include, without limitation:

    a. Purchasing a new pickup truck for Mr. Ward's personal use, with the approximate value of $85,000.

    b. Leasing a new office space in Rockville, Maryland, a move that cost Ellisdale $11,658.24.

    c. Throwing himself a lavish personal birthday party in Aspen, Colorado, spending in excess of $200,000.00 of Ellisdale's funds.

    d. Going on various other non-work-related travel and charging these expenses to Ellisdale.

31. Each of these purchases cost over $50,000, and they involved Ellisdale's funds, which were misappropriated by Mr. Ward without Mr. Ash's knowledge or consent. Some of these expenses originated as charges to Mr. Ward's personal credit cards, which were later paid off using Ellisdale funds. Thus, each of these purchases personally benefited Mr. Ward at the expense of EllisDale and directly violated the Operating Agreement's requirement that purchases over $50,000 be approved by both Mr. Ash and Mr. Ward. (Ex. A at § 6.09). Moreover, these personal expenditures represent a violation of Mr. Ward's fiduciary duties to Ellisdale as the expenditures have no business purpose related to Ellisdale.

32. Mr. Ash reasonably believes that there may be other significant unauthorized expenditures that Mr. Ash did not approve. Mr. Ash is unable to determine at this time the full extent of these impermissible transactions despite repeated requests to Mr. Ward for financial records.

*Mr. Ward's Additional Misconduct Concerning Ellisdale*

33. After October of 2022, Ellisdale had only two remaining employees, Ms. Black and Ms. Copeland, both of whom had, without Mr. Ash's knowledge, received large unapproved bonuses directed by Mr. Ward. Both Ms. Black and Ms. Copeland were working in managerial positions at Ellisdale, and together oversaw all accounting and office management duties for Ellisdale. In that role, Ms. Black and Ms. Copeland had access to the payroll, accounting, and IT accounts owned by Ellisdale. Ms. Black also had access to all of Ellisdale's banking information.

34. In the fall of 2022, the Parties worked to negotiate severance packages for Ms. Black and Ms. Copeland, who were ultimately terminated on December 2, 2022.

35. In the course of those negotiations, Mr. Ash instructed Ms. Black and Ms. Copeland to provide him with access to Ellisdale's payroll records. However, Mr. Ward told Ms. Black and

Ms. Copeland that they should not provide Mr. Ash with any records until after they received their severance pay.

36. Despite Mr. Ward's obstruction, Mr. Ash was able to gain access to the payroll records for the 2022 year through EllisDale's accounting and IT service providers. It was at this time that Mr. Ash discovered the unauthorized bonuses paid to the previous departing employees.

37. Mr. Ash learned that Mr. Ward was using Ms. Black and Ms. Copeland, and other Ellisdale employees, to help him conduct non-Ellisdale related business, such as his birthday party in Aspen, while they were at work for Ellisdale and being paid as employees of Ellisdale. This misuse of Ellisdale employee time took away from the work Ellisdale was required to complete in the ordinary course of its business. To the detriment of Ellisdale, Mr. Ward directed Ellisdale resources to other projects Mr. Ward was involved in, without compensating Ellisdale for the lost productivity of its employees.

38. Further, Mr. Ward called one of Ellisdale's financial vendors, Gus Kearney, and requested that Mr. Kearney enter into a non-disclosure agreement with Mr. Ward. When Mr. Kearny asked why Mr. Ward wanted such an agreement, Mr. Ward told Mr. Kearney, "if you find any criminal activities in the accountings, I don't want you to testify against me."

39. Mr. Ward's actions, in misusing and misappropriating the time and productivity of Ellisdale employees for his personal gain, as well as obstructing Mr. Ash's access to company information, violate the Operating Agreement and his fiduciary duty to Ellisdale.

*Actions of Mr. Ward Relating to District of Columbia Proceedings*

40. After the resolution of the prior litigation the Parties continued to take action, primarily through the efforts of Mr. Ash, to wind down the affairs of Ellisdale.

41. The only remaining asset of Ellisdale at this time, apart from the funds owed to EllisDale by Mr. Ward, is an apartment building in the District of Columbia owned by a wholly owned subsidiary of Ellisdale.

42. In May of 2023, the District of Columbia Superior Court ruled against Ellisdale and held that it would enter a judgment against Ellisdale in favor of a third party for in the amount of $4,064,586.00.

43. In response to the Superior Court's Judgment, Ellisdale filed an appeal to the District of Columbia Court of Appeals.

44. To avoid execution on the judgment and collection of the Superior Court Judgment during the pendency of the appeal, Mr. Ash proposed that Ellisdale post an appeal bond. An appeal bond would have the effect of protecting all of the assets of Ellisdale, including the aforementioned apartment building. This appeal bond also would have required the consent of Mr. Ward.

45. Despite his obligation to act in the best interest of Ellisdale, Mr. Ward refused to authorize an appeal bond to prevent collection of the Superior Court Judgment. The failure to authorize an appeal bond also meant Mr. Ash and Mr. Ward were forced to expend additional funds indemnifying their co-defendant, The Hartford insurance company.

46. Because no appeal bond was posted and settlement of the appeal was urgently needed to protect the assets of Ellisdale, Mr. Ash paid significant personal funds towards settlement of the Superior Court Judgment.

47. Mr. Ash would not have had to pay those personal funds towards settlement if Mr. Ward had acted in the best interest and authorized Ellisdale to post an appeal bond.

48. The amount due to Mr. Ash as a result of his payments from personal funds towards settlement of the Ellisdale Superior Court action is $680,000.

## COUNT I: BREACH OF CONTRACT

49. The allegations of the foregoing paragraphs are re-alleged and incorporated by reference as though fully set forth herein.

50. Effective January 1, 2010, Mr. Ward executed the Operating Agreement with Mr. Ash.

51. Mr. Ward breached numerous obligations to Plaintiffs under these agreements.

52. Under the Operating Agreement, Mr. Ward has, and at all relevant times has had, an obligation to Plaintiffs to abide by the Operating Agreement's terms. (Ex. A at §§ 6.01, 7).

53. Mr. Ward breached the Operating Agreement by making numerous unauthorized and improper transfers to himself and others.

54. Under the Operating Agreement, Mr. Ward has, and at all relevant times has had, an obligation to Plaintiffs to ensure that any "payments under the terms of contracts with such related parties will not be in excess of prevailing competitive rates for such transactions." (Ex. A at § 6.08).

55. Under the Operating Agreement, Mr. Ward has, and at all relevant times has had, an obligation to Plaintiffs to not unilaterally expend Ellisdale's funds to "purchase . . . any real or personal property by the Company having a value (including a value on the books of the Company) in excess of $50,000." *Id.* at § 6.09.

56. Mr. Ward also breached the Operating Agreement by:

   a. expending over $50,000 of Ellisdale's funds to purchase an approximately $85,000 pickup truck for his own use and without the approval of Mr. Ash,

   b. expending over $50,000 of Ellisdale's funds for unauthorized costs related to an office space in Rockville, Maryland without the approval of Mr. Ash,

    c.    expending over $50,000 of Ellisdale's funds to throw himself a lavish birthday party in Aspen, Colorado without the approval of Mr. Ash, and

    d.    expending over $50,000 of Ellisdale's funds to pay his personal travel expenses without the approval of Mr. Ash, as well as non-Ellisdale related travel expenses for other Ellisdale employees.

57.    Under the Operating Agreement, Mr. Ward has, and at all relevant times has had, an obligation to Plaintiffs to respect the fact that Mr. Ash—not Mr. Ward—is "the President/CEO of" Ellisdale and has "authority to (i) enter into contracts with customers, subcontractors or suppliers; (ii) hire employees and agents of the Company for such reasonable compensation as he will determine; (iii) terminate employees and agents of the Company; and (iv) execute, acknowledge

58.    Mr. Ward breached § 6.10(a) of the Operating Agreement by taking numerous such actions without informing Mr. Ash, including unilaterally raising his own salary and unilaterally giving bonuses to others.

59.    Under the Operating Agreement, Mr. Ward has, and at all relevant times has had, an obligation to Plaintiffs to ensure that "[a]ny and all distributions to Members and Assignees in their capacity as owners (i.e. not including compensation) . . . be pro rata among all Members and Assignees in their ratio of overall Percentage Interests in the Company," and "[t]o the extent any distributions are not pro rata, . . . promptly repay such non-pro rata amounts upon request by the Company." (Ex. A at § 9.05).

60.    Mr. Ward breached this provision by distributing hundreds of thousands of dollars from Ellisdale to himself personally and falsely labelling this distribution as a "salary" despite failing to perform any meaningful work for Ellisdale.

61. Under the Operating Agreement, Mr. Ward has, and at all relevant times has had, an obligation to Plaintiffs to respect the fact that "the Board of Managers will arrange for the appropriate conduct of [Ellisdale's] accounts" and not unilaterally transfer those funds to himself and others. *Id.* at § 9.05.

62. Mr. Ward breached this provision by making numerous unauthorized and improper transfers to himself and others.

63. Mr. Ward has also breached the Promissory Note by failing to repay all sums due thereunder by December 31, 2023.

64. As a result of these breaches, Plaintiffs have suffered and continue to suffer damages in the amount of at least $2,500,000. Additional damages may be identified during the course of this litigation, and Plaintiffs reserve the right to amend their Complaint and seek compensation for such damages.

## COUNT II: BREACH OF FIDUCIARY DUTY

65. The allegations of the foregoing paragraphs are re-alleged and incorporated by reference as though fully set forth herein.

66. As a Managing Member of Ellisdale Mr. Ward owed and continues to owe a fiduciary duty to the Plaintiffs to act honestly and loyalty with respect to Ellisdale's affairs.

67. Mr. Ward breached these duties by making the unauthorized and improper transfers described herein concealing those transfers from Mr. Ash, and committing the other dishonest acts against Ellisdale described herein.

68. Furthermore, since the filing of this action, Mr. Ward has breached his fiduciary duty to Mr. Ash and to Ellisdale by refusing to authorize an appeal bond for the Superior Court Judgment while an appeal was pending, resulting in damage to Mr. Ash.

69. Mr. Ward committed these acts willfully and maliciously. His motive was one of revenge against Mr. Ash for unspecified personal grievances instead of the best interests of Ellisdale.

70. For example, in response to an innocuous question regarding permit applications, on March 18, 2024, Mr. Ward accused Mr. Ash of fabricating an explanation to the District of Columbia for why decks fell away from the apartment building owned by Ellisdale's subsidiary. His email claimed "I never agreed to be involved in your story about the decks" despite Mr. Ward having previously insisted the decks be addressed and having received a professionally prepared report that identified the cause of the deck failures.

71. Previously Mr. Ward claimed that he made these improper transfers to get even with Mr. Ash for benefits he perceived Mr. Ash was not entitled to, such as the use of company vehicles or salary increases. However, Mr. Ward was aware that Mr. Ash was the CEO and had the power of the CEO, as defined in the Operating Agreement, to make such decisions and Mr. Ward had no such authority. Thus, Mr. Ward had actual knowledge that his authorization of the improper transfers (additional salary, payments, bonuses) described herein were without any legal authority.

72. As a result of these breaches of Mr. Ward's fiduciary duties, Plaintiffs have suffered damages in the amount of at least $2,500,000. Additional damages may be identified during the course of this litigation, and Plaintiffs reserve the right to amend their Complaint and seek compensation for such damages.

73. Additionally, due to the willful and malicious nature of Mr. Ward's actions, Plaintiffs are entitled to punitive damages at least in the amount of $350,000.

**COUNT III: CONVERSION**

74. The allegations of the foregoing paragraphs are re-alleged and incorporated by reference as though fully set forth herein.

75. Mr. Ward has intentionally exerted dominion over Plaintiffs' property in a manner that is inconsistent with Plaintiffs' rights.

76. For example, and without limitation, Mr. Ward intentionally exerted dominion over Ellisdale's funds by making the unauthorized and improper transfers described herein, and by taking funds, relocating them, and retaining them for his own personal benefit.

77. These improper transfers were retained or diverted by Mr. Ward in identifiable transactions.

78. Mr. Ward committed these acts willfully and maliciously.

79. As a result of these conversions, Plaintiffs have suffered and continue to suffer damages in the amount of at least $2,500,000. Additional damages may be identified during the course of this litigation, and Plaintiffs reserve the right to amend their Complaint and seek compensation for such damages.

80. Additionally, due to the willful and malicious nature of Mr. Ward's actions, Plaintiffs are entitled to punitive damages in the amount of $350,000.

**ALTERNATIVE COUNT IV: UNJUST ENRICHMENT**

81. The allegations of paragraphs one through forty-eight are incorporated herein by reference.

82. This Count is plead in the alternative, to the extent that the Court or a finder of fact concludes there are no terms of any contract that control the rights of the Parties to authorize expenditures of Ellisdale funds.

83. As set forth above, Mr. Ward received unauthorized funds, salary increases, and benefits (such as personal expenses paid by the company) without proper authorization. The salary increases and personal payments received by Mr. Ward were in contravention of the established procedure by which Ellisdale typically made such payments.

84. Through directions issued to Ellisdale employees and vendors, Mr. Ward caused Ellisdale to make those payments to himself.

85. These funds were taken from Ellisdale, reducing the company's financial resources, to Mr. Ward's sole benefit, such that it is equitable for those funds to be returned to Ellisdale.

86. Mr. Ward was, or reasonably should have been aware, that receipt of these funds was without legal justification and under circumstances that indicate he was unjustly enriched.

## ALTERNATIVE COUNT VII: NEGLIGENCE

87. The allegations of paragraphs one through forty-eight are incorporated herein by reference.

88. This Count is plead in the alternative, to the extent that the Court or a finder of fact concludes there are no terms of any contract that control the rights of the Parties to authorize expenditures of Ellisdale funds.

89. Mr. Ward had a duty to manage Ellisdale's assets responsibly as a co-owner and manager. Mr. Ward breached this duty by mismanaging the company's funds and failing to adhere to Ellisdale's standard financial protocols. The salary increases, bonuses, personal payments, and other expenditures authorized by Mr. Ward were in contravention of the established procedure by which Ellisdale typically made such payments.

90. Through his efforts Mr. Ward received unauthorized funds, salary increases, and benefits (such as personal expenses paid by the company) without proper authorization.

91. His mismanagement directly resulted in financial losses to Ellisdale.

## **PRAYER FOR RELIEF**

WHEREFORE Kevin D. Ash, for himself, and Kevin D. Ash, derivatively on behalf of Ellisdale Construction LLC, respectfully pray that this Court enter an order ADJUDGING, ORDERING, and DECREEING that:

a. Plaintiffs be awarded compensatory damages in the amount of $3,500,000;

b. Plaintiffs be awarded punitive damages in the amount of $350,000, or the maximum allowed under law;

c. Plaintiffs be awarded pre- and post-judgment interest;

d. Plaintiffs be awarded their costs; and

e. Plaintiffs be awarded all such other and further relief as the Court deems proper.

Respectfully Submitted,
KEVIN D. ASH
INDIVIDUALLY AND DERIVATIVELY FOR
ELLISDALE CONSTRUCTION, LLC,
By Counsel

Dated: May 31, 2024

__/s/ Thomas Dunlap_____
Thomas Dunlap (VA Bar No. 44016)
Ryan Kennedy (VA Bar No. 76946)
Dunlap Bennett & Ludwig PLLC
211 Church St, SE
Leesburg, VA 20175
Telephone: (703) 777-7319
Facsimile: (703) 777-3656
tdunlap@dbllawyers.com
rkennedy@dbllawyers.com

*Counsel for Plaintiffs*